*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2012-339

MAY TERM, 2013

| | | |
|---|---|---|
| Warren Vail, III | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Washington Unit, |
| v. | } | Civil Division |
| | } | |
| | } | |
| Vermont Agency of Transportation, et al. | } | DOCKET NO. 901-12-10 Wncv |

Trial Judge: Michael S. Kupersmith

In the above-entitled cause, the Clerk will enter:

Plaintiff employee appeals from the superior court's decision granting defendant employer, the State of Vermont,[*] summary judgment with respect to his lawsuit alleging discriminatory termination of his employment. We affirm.

This Court reviews "summary judgment[] under the same standard as the trial court, affirming where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Lamay v. State, 2012 VT 49, ¶ 6, 191 Vt. 635 (mem.). In determining whether there is a genuine issue as to any material fact, the Court "accept[s] as true all allegations made in opposition to the motion for summary judgment, so long as they are supported by admissible evidence." Fritzeen v. Gravel, 2003 VT 54, ¶ 7, 175 Vt. 537 (mem.).

Plaintiff is proceeding pro se on appeal but was represented by counsel before the trial court. In granting summary judgment to defendant, the trial court noted at the outset that employee's lengthy statement of undisputed facts accompanying his own motion for summary judgment referred to evidence that ostensibly supported the motion but in fact was not submitted with the motion. The trial court set forth a lengthy rendition of facts that it found to be uncontested by plaintiff. Those undisputed facts, the vast majority of which plaintiff does not challenge on appeal, reflect the following. Plaintiff began working for defendant in August 2001 as a civil engineer in the Transportation Policy and Planning Division. His work went well at first, but by early 2004, his supervisor had documented numerous performance concerns in a memo to plaintiff. The April 2004 memo referred, in part, to unexcused absences and untimeliness in completing tasks. In June 2004, plaintiff received a formal oral reprimand as the result of his unexcused absences. In July 2004, plaintiff arrived at work intoxicated and later received a formal written reprimand as a result of the incident.

---

[*] Plaintiff filed suit against his employer, the Agency of Transportation (AOT), and various agency employees in their official capacities. For the sake of simplicity, we will refer to AOT and its employees named in the suit as AOT or defendant.

In September 2004, plaintiff was admitted to the Brattleboro Retreat for medically assisted alcohol detoxification and mood stabilization. The admission note indicated that he was currently consuming twenty-four to thirty beers a day. Plaintiff entered another treatment facility in late September 2004, but did not complete treatment and left against medical advice. In connection with this treatment, plaintiff applied for and was granted medical leave under the Family and Medical Leave Act (FMLA) for the period between mid-September and the beginning of November 2004. Plaintiff again applied for and was granted FMLA leave, this time as "reduced hours" with Fridays off from mid November 2004 through mid-May 2005. At that time, he was told, among other things, that he must produce a doctor's note to substantiate any additional medical leave.

In December 2004, plaintiff was given a notice of pending disciplinary charges for unauthorized absences. He was reminded of prior instructions to provide documentation for absences, and he was told that his failing to do so could result in further disciplinary actions, including termination of employment. He was also told in the same letter that the Employee Assistance Program might be of help to him if he was experiencing personal issues affecting his work and that he could contact human resources at a specified telephone number and request accommodations if he believed he had an impairment affecting his ability to perform the essential functions of his job. Plaintiff neither informed anyone that he had a disability nor requested any work-related accommodations.

On January 11, 2005, plaintiff was once again admitted to the Brattleboro Retreat to treat his abuse of alcohol. The chief complaint was listed as acute alcoholism, and the goal was detoxification. The discharge report indicated that he reported drinking twenty-four to thirty beers a day and missing 120 hours of work in the previous two months. He was discharged against medical advice on January 13, 2005.

Plaintiff's attendance problems continued despite his reduced work schedule. In April 2005, he was given supervisory feedback that, among other things, required him to provide missing documentation for six absences that month. He never provided the documentation.

In May 2005, plaintiff was arrested for the third time in Vermont for driving while intoxicated. That same month, his request for leave from work was granted even though he had exhausted his twelve weeks of annual FMLA leave. Plaintiff again entered the Brattleboro Retreat to detoxify. He remained there until mid-June 2005. In July 2005, plaintiff received a written reprimand for unexcused absences that had occurred in April of that year. The written reprimand once again advised plaintiff that any further misconduct would not be tolerated and could result in further disciplinary action, including dismissal. Meanwhile, in late June 2005, plaintiff was transferred to the Structures Unit within the AOT.

In September 2005, plaintiff was injured when he fell off of his bike. Notes from the ensuing hospital emergency room visit indicate that he smelled of alcohol. He was granted medical leave beginning in mid-November 2005 to recover from surgery resulting from the accident. While on leave, plaintiff again checked into an alcohol-treatment facility. He was in treatment for approximately a month from late December 2005 until late January 2006. He returned to work in late February 2006.

Plaintiff's unauthorized absenteeism continued in the following months. From March 2006 to December 2006, he missed all or part of sixty-six work days, often without authorization

or explanation. In January 2007, he was absent for all or part of twelve out of a possible twenty-one work days. As a result of plaintiff's continued absenteeism, his supervisor scheduled a feedback meeting with him. At the meeting, the supervisor laid out the policy for requesting and documenting leave time, including setting up a phone tree for plaintiff to use to notify his employer of his absences. Once again, plaintiff was reminded that he had to provide a doctor's authorization for any medical absences.

Despite this feedback, plaintiff's unexcused absences continued, and in late February 2007, plaintiff was sent a "Right to Representation" letter notifying him of a disciplinary meeting in early March 2007. Plaintiff missed the meeting and it was rescheduled on multiple occasions due in part to plaintiff's intervening misconduct involving insubordination and the use of obscene language when interacting with his supervisor. In a March 27, 2007, interview in which he was present with a union representative, plaintiff acknowledged many unexcused absences but did not allude to having a disability or needing any particular accommodation.

Plaintiff's unexcused absences continued, and on May 2, 2007, plaintiff was suspended from work without pay for twenty days. Plaintiff was given an opportunity to refute the charges, but did not do so and did not claim that his misconduct was a result of a disability or a lack of accommodation on his employer's part.

Plaintiff returned to work on May 30, 2007. Upon his return, there was a feedback meeting and his supervisor sent him an e-mail reminding him of the requirements regarding any future absences. The following day, May 31, plaintiff sent a lengthy e-mail to his supervisor and others: (1) apologizing for the past problems; (2) taking full responsibility for his actions; (3) noting that he was submitting that day a FMLA schedule adjustment "for my medical situation" concerning a back injury; (4) stating that he has "certain limitations or frailties that would and are considered disabilities"; (5) asking how he "can best communicate these frailties that are directly linked to some or all of the problems to varying degrees"; (6) expressing the belief that a "humane understating should be implemented in managing and supervising my assets"; (7) stating that "disclosure of these disabilities would help in understanding managing and supervising myself"; (8) specifically requesting that "assets and attributes be identified"; (9) asking for an adjustment to his hours to accommodate his bus schedule but stating that he would adhere to the regular hours if necessary; and (10) expressing appreciation for help in his professional development to a degree beyond what any past employer had done.

On June 6, 2007, plaintiff met briefly with his supervisor and others to discuss his FMLA "intermittent" leave request related to his back injury. A human resources specialist also gave plaintiff a copy of the State's Reasonable Accommodations Policy and the form on which to request an accommodation. According to a June 6, 2007, e-mail from plaintiff's supervisor, the meeting ended prematurely because plaintiff asked for more time to consider the schedule he was requesting. A June 7, 2007, e-mail from plaintiff in response, however, suggested that the meeting ended abruptly because of the confrontational attitude of one the supervisors attending the meeting. In that same e-mail, plaintiff stated that he had "dis[]abilities of which hardships and damages are being overlooked and u[n]responded to in the process," and that he had "repeatedly requested ADA dis[]abiltity, confidential coordination, in regards to my ADA and FMLA rights and the issues and services of coordination I have requested on my behalf have not been responded to[] and have been ignored."

On June 8, 2007, plaintiff was granted his request to have a reduced six-hour work schedule. The approval extended until August 8, but the reduced schedule ended on June 13 at plaintiff's request, which was supported by a note from plaintiff's physician stating that his back pain had subsided to the point where he could assume full-time work. On June, 14, 2007, the same human resources specialist who had previously given plaintiff an accommodation form sent plaintiff a letter stating that "if you believe that you have an impairment that affects your ability to perform the functions of your position, you may request an accommodation in accordance with the State's Reasonable Accommodation Policy (Policy 3.2) as I previously provided to you on June 6, 2007." The letter enclosed an additional copy of the policy and the form, as well as plaintiff's job specifications, to assist him. Nevertheless, plaintiff did not submit an accommodation form. Nor did he indicate the he was incapable of filling out the form or request help in doing so.

Plaintiff's attendance at work improved slightly in June and July of 2007, but he was present for only two work days in August 2007. The unexcused absences continued throughout the fall of 2007. On December 20, 2007, when plaintiff returned to work after an extended unexplained absence, he was given a letter informing him that AOT was considering discipline up to and including dismissal. The next morning, plaintiff was observed photographing the entrance to his work place and later left literature for the supervisor about whom he had complained detailing casualties during World War I by type of weapons used. These actions raised concerns with his supervisors, who called police. At the advice of police, plaintiff was removed from the building and placed on administrative leave. That turned out to be his last day of work.

On January 3, 2008, plaintiff and a union representative attended a disciplinary meeting at which he was informed that AOT intended to terminate his employment. Ensuing negotiations over a proposed separation agreement were unsuccessful. Plaintiff never responded to a letter that stated unless an agreement was reached, his employment would be terminated effective April 11, 2008.

In mid-March 2008, plaintiff was readmitted at the Brattleboro Retreat for in-patient alcohol treatment. He remained there until late April 2008. By letter dated May 6, 2008, plaintiff was informed that his employment would be terminated at the end of the day May 7, 2008. By letter dated May 5, 2008, one day before AOT's termination letter, plaintiff filed with AOT a reasonable accommodation request form that did not describe any particular disabilities but requested accommodations such as flexibility in scheduling, time off as needed, and better communication. AOT did not respond to the form as it considered plaintiff's employment terminated at that point.

Plaintiff's original complaint, filed in December 2010, cited twenty-one causes of action for alleged disability discrimination under various theories of liability arising under federal and state statutes and the common law. After some claims were withdrawn and others dismissed, eight claims—sounding in failure to accommodate, wrongful termination, hostile work environment, and discriminatory removal from the workplace—remained under the Vermont Fair Employment Practices Act (FEPA), 21 V.S.A. §§ 495-496, and the federal Rehabilitation Act of 1973, 29 U.S.C. § 794. The essence of plaintiff's remaining claims is that he was subjected to a hostile work environment, was not provided accommodations to address his disabilities, and, as a result, was wrongfully terminated due to performance deficiencies caused by the lack of accommodations. The parties cross-moved for summary judgment, but plaintiff

4

failed to comply with summary judgment procedures, as indicated above. In a detailed decision, the trial court granted summary judgment to the State on all of plaintiff's remaining claims, concluding that plaintiff had failed as a matter of law to come forward with any evidence indicating that his employer had created a hostile work environment or declined to interact with him about providing any work-related accommodations that would allow him to perform the essential functions of his job successfully.

On appeal, plaintiff argues that: (1) there are genuine issues of material fact precluding summary judgment; (2) his May 31, 2007, and June 7, 2007 e-mails were sufficiently specific to put his employer on notice that he was requesting reasonable accommodations for a disability to enable him to complete the essential functions of his job; (3) AOT's previous provisions of a flexible schedule and unpaid leave time did not demonstrate that his employer had met its good faith duty to accommodate him; and (4) the undisputed facts demonstrate that he was subjected to a hostile work environment.

Before addressing these arguments, we note that the standards applicable to both FEPA and the federal Rehabilitation Act are borrowed from the Americans with Disabilities Act (ADA). Kennedy v. Dep't of Pub. Safety, 168 Vt. 601, 601-02 (1998) (mem.). (stating that FEPA is patterned after federal Rehabilitation Act and therefore Vermont courts look to interpretations of that statute in determining whether plaintiff has met elements of claim); 29 U.S.C. § 701 (incorporating ADA standards into Rehabilitation Act). "To prove discrimination under [either] Act, plaintiff must show that he is a 'qualified handicapped individual,' that is one 'who is capable of performing the essential functions of the job or jobs for which he is being considered with reasonable accommodations.' " Gallipo v. City of Rutland, 163 Vt. 83, 91-92 (1994) (quoting 21 V.S.A. §§ 495d(6) and 495d(12)). Although alcoholism is a disability protected by FEPA, "adverse employment actions taken for misconduct are not discriminatory even though an employee was an alcoholic and the misconduct was related to the misuse of alcohol." Kennedy, 168 Vt. at 602.

Plaintiff cites five issues of material fact that he contends should have precluded summary judgment in this case. The first one is whether his absences would have been eliminated if he had been provided with the accommodations of positive reinforcement, non-hostile communication, flexibility in coming to work, treatment and relief on an off-payroll status as needed, general flexibility as stated in accommodation network materials, and advancement training.

Before addressing this question, we consider whether, and if so when, plaintiff's request for accommodations was presented to defendant. Plaintiff claims that his statements in the May 31, 2007, and June 7, 2007, e-mails were sufficient to put his employer on notice that he was requesting reasonable accommodations for his disabilities. We find this contention unavailing for the following reasons. Although plaintiff generally spoke of needing accommodations for his "frailties," he did not explicitly mention any particular disabilities—other than his alcoholism, of which the parties were well aware—or indicate any particular accommodations to address his unnamed "frailties." He did suggest in those e-mails, however, that he wanted to have a dialogue on this subject. In response to the e-mails, an AOT human resources specialist, who had attended meetings with plaintiff, promptly informed plaintiff of his rights and provided him with a form on which he could indicate any specific disabilities and needed accommodations. He never filled out the form even though nothing in the record indicates that he was incapable of doing so or that he sought but did not receive help in filling out the forms.

5

In fact, the record demonstrates that on several occasions he had successfully filled out forms to seek medical leave under FMLA, and that he finally filled out an accommodations form on May 5, 2008, two days before his termination date after his employer had already informed him of its decision to terminate him. At that point, the termination decision had been made. This case is easily distinguishable from <u>Bultemeyer v. Fort Wayne Cmty. Sch.</u>, 100 F.3d 1281, 1286 (7th Cir. 1996), where the court stated that a "few hours' tardiness should not be the reason for cutting off the interactive process [of workplace accommodation]."

Moreover, nothing in the record suggests that defendant knew or should have known that plaintiff had mental limitations preventing him from being able to identify his disabilities and seek accommodations, such that the onus was on it to initiate an interactive process to explore what those disabilities might be and how to address them. Cf. <u>id</u>. (concluding that employer had expanded duty to engage in interactive process where employee who suffered from paranoid schizophrenia was unable to articulate to employer that he wanted employer to accommodate his disability). To be sure, defendant certainly was aware that plaintiff had a significant alcohol problem, and may well have been aware that he suffered from depression, insofar as treatment facility notes indicated as much from as far back as 2004. But nothing in the record suggests that defendant should have suspected that plaintiff could not identify any disabilities he had and seek accommodations based on any such disabilities. To the contrary, the record reveals that plaintiff sought accommodations for various reasons over the years, and defendant was receptive to his requests.

Even if we assume that plaintiff made timely requests for accommodation, in the May 31, and June 7, 2007 e-mails, or that defendant should have done more to proactively engage plaintiff in an interactive process to identify his disabilities, we find no support in the record for plaintiff's argument that there was a jury question as to whether his proposed accommodations would have allowed him to successfully complete the essential functions of his job. In support of this argument, plaintiff relies primarily upon two short, virtually identical affidavits signed on June 12, 2012, by a doctor and a therapist who had treated him. The doctor's affidavit stated in its entirety as follows:

> Based on my professional experience and training I believe I am qualified to assert that reasonable accommodations provided by the Vermont Agency of Transportation (AOT) to my patient Warren Vail would have a reasonable likelihood of succeeding to allow Mr. Vail to come to work regularly and comply with other requirements to satisfy the essential job functions of his position, including one or more of the following accommodations:
>
> --AOT management utilizing a communication style that is not perceived by Mr. Vail to be threatening or hostile.
>
> --AOT management identifying Mr. Vail's positive attributes and strengths, as well as the provision of praise and reinforcement.
>
> --AOT management providing flexibility in work hours.
>
> --AOT management reminding Mr. Vail of important dates and/or events.

6

> I am also qualified to make the professional observation that alcoholism was not the primary reason Mr. Vail was unable to perform his employment duties or attend the workplace in 2007. Rather, it was Mr. Vail's unaccompanied psychiatric conditions due to depression that were the primary cause of any failure by Mr. Vail to attend work in 2007. Additionally, the primary reason Mr. Vail was unable to comply with AOT's documentation rules and complete AOT's reasonable accommodation form was because of his disabling medical conditions.

The other affidavit signed by plaintiff's therapist on the same day was exactly the same except the last paragraph began with the clause "Based on my clinical notes and observations" rather than the clause "I am also qualified to make the observation that."

The trial court discounted these affidavits because they contain summary conclusions inconsistent with the medical providers' deposition testimony. As a general matter, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial." Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996) (quotations omitted). In the affidavits, the medical providers claim that they are qualified to offer opinions regarding reasonable accommodations, but that claim is directly contrary to their deposition testimony that they had limited or no experience addressing issues related to workplace accommodations. Moreover, the assertion in the affidavits that the suggested reasonable accommodations would have allowed plaintiff to satisfy his essential job functions is contrary to the medical providers' deposition testimony acknowledging that those accommodations would not have addressed plaintiff's absenteeism. We agree with the trial court that the affidavits, which appear to be crafted to avoid summary judgment, do not preclude summary judgment in this case. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in [an] affidavit opposing summary judgment and that affidavit contradicts [the affiants'] own prior deposition testimony."); Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony.").

Discounting the affidavits submitted by plaintiff to avoid summary judgment, there is nothing in the record suggesting that the accommodations proposed by plaintiff, even assuming that they were timely presented to defendant, would have prevented plaintiff's absenteeism. As for flexibility in work hours, the record demonstrates that AOT accommodated plaintiff whenever he sought flexibility in his work hours. He was granted medical leave on several occasions, even after his FMLA hours had been exhausted, to address his alcoholism. He was granted a shortened work week and later a shortened and alternate work day, as requested. To the extent that plaintiff is suggesting he should have been allowed to come and go when he pleased, as he did in his deposition testimony, that would be entirely unreasonable, given the nature of his position working with other members of a team.

Nor, as the trial court concluded, is there any evidence of a hostile work environment devoid of supportive communication. Apart from plaintiff's expressed belief that his time was being micromanaged, which is not surprising given his history of absenteeism, the only evidence

of any confrontational behavior is a reference plaintiff made in an e-mail regarding the actions of one supervisor at one meeting in 2007. There is nothing in the record even remotely suggesting that a different managerial communication style would have prevented plaintiff's longstanding and excessive absenteeism.

Plaintiff's second alleged genuine issue of material fact is whether regular attendance was an essential function of his job. Here, the undisputed evidence in the record demonstrates that plaintiff was frequently absent from work over the course of years. In 2007 alone, he was absent nearly half of the possible work days, and most of those absences were unexcused. Obviously, regular attendance beyond plaintiff's excessive absenteeism was an essential function of a job that required him to work with other team members. See Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 33-34 (1st Cir. 2011) ("This Court—as well as the majority of circuit courts—has recognized that attendance is an essential function of any job." (quotation omitted)); Javanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 899-900 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting . . . ."). We need not determine whether regular attendance is an essential function of jobs generally; on the basis of the undisputed facts in the record concerning the team-based nature of plaintiff's job, we conclude that the evidence in the record does not create a genuine dispute as to the essential nature of regular attendance to plaintiff's job.

Plaintiff's third alleged genuine issue of material fact concerns his termination date. He claims, incorrectly, that the trial court found he was terminated on April 11, 2008, rather than on May 6, 2008. The court found that even though an earlier letter suggested that the effective date of his termination would be April 11 if the parties did not sign a separation agreement beforehand, plaintiff's termination actually took effect on May 7, 2008. For the reasons discussed above, the fact that his termination was effective two days after he finally submitted a request for accommodation, and well after the State indicated its intent to terminate him is not significant in this case.

Plaintiff's fourth alleged genuine issue of material fact is whether his absenteeism was caused by alcohol or depression or both. It may well be that plaintiff's depression played some role in his alcoholism and resulting excessive absenteeism. But, as discussed above, plaintiff never notified defendant of any disability associated with his depression, and, in any event, nothing in the record suggests that his proposed accommodations would have been effective in preventing his absenteeism. See McBride v. BIC Consumer Prod. Mfg. Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009) ("The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment.").

Plaintiff's fifth genuine issue of material fact is whether his employer created a hostile work environment, in particular by leaving his medical records in a place where they could be viewed by others. As the trial court found, however, although the parties agree that on a few occasions plaintiff's medical records may have appeared in a place where others could have viewed them, there was no evidence suggesting that plaintiff's supervisor ever placed the records in a public location for any reason at all, let alone for the purpose of embarrassing him, or that any of his coworkers actually saw the records.

Upon review of the record, for the reasons discussed above, we find unavailing plaintiff's arguments that there is a jury question as to whether his employer subjected him to a hostile work environment and refused to make a good faith effort to accommodate his disabilities. Nor is there any viable jury question on the issue of whether the employer's actions in removing him from his workplace on what turned out to be his last day of work were discriminatory in nature. The employer acted on the advice of police after plaintiff undisputedly engaged in behavior that reasonably could have been perceived as threatening in nature, including leaving literature concerning weapons and casualties with a supervisor about whom he had complained.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice

9